UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
| | : | |
|--|--|--|
| *In re:* | : | |
| | : | Case No. 11-11388 (JLG) |
| Big Apple Volkswagen, LLC, | : | Chapter 11 |
| *Debtor* | : | |
| | : | |

-------------------------------------------------------- x
| : |
| Alan Nisselson, Chapter 7 Trustee of Big | : |
| Apple Volkswagen, LLC, | : |
| | : |
| *Plaintiff* | : |
| | : | Adv. Proc. No. 11-2251 (JLG) |
| *v.* | : |
| | : |
| Ratiba Salim and Wahid Saleem, | : |
| *Defendants* | : |

-------------------------------------------------------- x

**MEMORANDUM DECISION AND PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW TO GRANT IN PART AND DENY IN PART PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**A P P E A R A N C E S :**

WINDELS MARX LAND & MITTENDORF, LLP
*Attorneys for Plaintiff Alan Nisselson, Trustee*
156 West 56th Street
New York, New York 10019
<u>By:</u>    Alan Nisselson, Esq.
         John J. Tepedino, Esq.

DAHIYA LAW OFFICES LLC
*Attorneys for Defendants Ratiba Salim and Wahid Saleem*
75 Maiden Lane, Suite 506
New York, New York 10038
<u>By:</u>    Karamvir Dahiya, Esq.

**JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

Before the Court is Plaintiff Alan Nisselson's Motion for Partial Summary Judgment [AP ECF Doc. Nos. 39, 40, 41, and 60, collectively][1] (the "**Motion**")[2] on his June 14, 2011 complaint [AP ECF Doc. No. 1] (the "**Complaint**")[3] against defendants Ratiba Salim ("**Ratiba**") and Wahid Saleem ("**Wahid**") (collectively, the "**Defendants**").  Mr. Nisselson is the court-appointed chapter 7 trustee (the "**Trustee**") for the estate of Big Apple Volkswagen, LLC ("**Big Apple**" or the "**Debtor**").  In the Complaint, the Trustee seeks to avoid and recover as fraudulent and preferential under federal and state law Debtor's prepetition transfer of estate funds to Ratiba, and her subsequent transfer of real property located at 8529 65th Road, Rego Park, New York titled in her name, and that had been freed of a mortgage using some of the Debtor's funds transferred to Ratiba (the "**Premises**"), to her husband, Wahid.[4]

---

[1] Citations to "ECF Doc. No. __" or to AP ECF Doc. No. __" refer to the location that the referenced document can be found on the Court's electronic case filing dockets for this case and adversary proceeding, respectively.  Citations to "12 Civ. Dkt. No. _" refer to the location that the referenced document is in 12 Civ. 92 (PGG) and "15 Civ. Dkt. No. _" refer to the location that the referenced document is in 15 Civ. 4629 (PGG), as applicable, both as commenced in the United States District Court for the Southern District of New York.

[2] The Motion is comprised of the (i) *Motion for Summary Judgment (Partial)*, including the *Affidavit of Alan Nisselson in Support of Motion for Partial Summary Judgment*, and exhibits thereto [collectively, AP ECF Doc. No. 39 through 39-26] (the "**T. Aff.**"), *Local Bankruptcy Rule 7056-1 Statement of Material and Undisputed Facts* [AP ECF Doc. No. 40] (the "**7056-1 Statement**"); *Memorandum of Law in Support of the Motion* [AP ECF Doc. No. 41] (the "**T. Memo.**"); and *Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgment* [AP ECF Doc. No. 60] (the "**Reply**").

[3] When citing to the Complaint, the notation "Compl. ¶ __" refers to paragraphs in the Complaint.

[4] *See* T. Memo. 1.  In the Complaint, among other things, the Trustee alleges that he is entitled to a judgment against Wahid (i) avoiding and preserving the Subsequent Transfer, (ii) directing that the Subsequent Transfer be set aside, and (iii) recovering the Subsequent Transfer or the value thereof from Wahid for the estate's benefit.  Compl. ¶ 65.  For these purposes, the term "Subsequent Transfer" means "Ratiba Salim's subsequent transfer to Defendant Wahid Saleem of property freed from a mortgage obligation through use of the Debtor's funds."  Compl. ¶ 2.  The "property" referenced in the definition of "Subsequent Transfer" is the Premises.  Compl. ¶¶ 14-15.

Only the first of the Complaint's nine claims for relief is relevant to the Motion.[5]  There the Trustee is seeking to avoid and recover payments made by the Debtor to Ratiba as preferential transfers under the Bankruptcy Code (the "**Code**").  The gravamen of the Motion is that prepetition, Julian Salim ("**Julian**"), Big Apple's former managing member and majority owner, caused the Debtor to make two transfers aggregating $705,000 (the "**Transfers**") to an account at the Queens County Savings Bank bearing Ratiba's name and the address of the Premises (the "**Bank Account**"), in satisfaction of debts then due and owing to her by the Debtor totaling no less than $675,000.  Ratiba is Julian's mother. A portion of that indebtedness consisted of a $300,000 loan that Ratiba made to Julian and the Debtor in 2006.  Ratiba financed that loan by taking out a $300,000 mortgage (the "**Mortgage**") on the Premises.  The Trustee seeks a judgment pursuant to §§ 547, 550 and 551 of the Code (i) avoiding the Transfers and preserving them for the benefit of Debtor's estate; (ii) directing that the Transfers be set aside; and (iii) recovering the Transfers, or the value thereof, from Ratiba for the benefit of the Debtor's estate.  To the extent that the Transfers are avoided, the Motion also seeks a judgment avoiding Ratiba's conveyance of the Premises to Wahid, her husband and Julian's father, as a subsequent transferee of the value of a portion of the avoided Transfers.  It is undisputed that before Ratiba conveyed the Premises to Wahid, approximately $335,000 from the Transfers was paid to a third party mortgagee (the "**Mortgagee**"), for Ratiba's benefit, to satisfy the Mortgage.

---

[5] *See Notice of Trustee's Motion Pursuant to Bankruptcy Rule 7056 and Rule 56 of the Federal Rules of Civil Procedure for Partial Summary Judgment on his First Claim for Relief for Avoidance and Recovery of Preferential Transfers as Set Forth in Complaint Against Ratiba Salim and Waheed Salim* [AP ECF Doc. No. 39] (stating that Trustee seeks "partial summary judgment on his first claim for relief for avoidance and recovery of preferential transfers as set forth in his complaint against Defendants Ratiba Salim and Waheed Salim").

The Motion was previously before the Court on March 11, 2014 (the "**March 2014 Hearing**").  Defendants did not respond to the Motion,[6] but their counsel participated at that hearing.[7]  Counsel advised the Court that Defendants did not oppose the Motion and that they acknowledged that the Transfers were preferential payments, but that they denied liability for the Transfers because they allegedly had no control over the Bank Account.  Counsel objected on the record to the entry of any order holding Defendants liable for the Transfers.[8]  On March 12, 2014, the Court[9] issued a memorandum decision granting the Motion, and on March 20, 2015, the Court entered an order granting the Trustee summary judgment on the First and Eighth Claims for Relief in the Complaint.  *See Nisselson v. Salim*, Adv. Proc. No.11-2251 (RG), Mar. 12, 2014 Mem. Decision [AP ECF Doc. No.  45] (the "**Decision**"); March 20, 2014 Order Granting the Motion [AP ECF Doc. No. 46] (the "**Order**").  On June 26, 2014, the Court entered final judgment with respect to the First and Eighth Claims for Relief in favor of the Trustee on

---

[6]  Defendants had ample opportunity to respond to the Motion.  By *Stipulation and Order Regarding Briefing Schedule* "so ordered" by the Court on February 19, 2014 [AP ECF Doc. No. 44], the Defendants were granted an additional eleven days to file a brief in opposition to the Motion, but failed to do so.

[7]The record of the March 2014 Hearing reflects that Defendants were represented at that hearing by Navpreet Kaur of the Kadochnikov Law Group, who appeared at the hearing on behalf of Defendants' then counsel of record, Lust & Leonov.  *See* Transcript of March 2014 Hearing ("**March 2014 Tr**.") [AP ECF Doc. No. 68] at 1:18-21 and 2:7-10.

[8] Ms. Kaur advised the Court that "[Defendants] have no opposition to the motion.  It's clear.  The Defendants believe that there is no argument that the funds were put in Mr. and Mrs. Salim's account."  March 2014 Tr. at 2:17-19.  *See also Id*. at 4:12 – 15 (Ms. Kaur conceding that transfer of funds to the Bank Account constituted preferential payments).  However, Ms. Kaur was clear that Defendants denied that they were liable for the Transfers "[b]ecause from the depositions it seems as if Defendants had no control over the accounts  . . . ."  *See, e.g., Id.* at 2:21-22.  Accordingly, she advised the Court that she was appearing at the hearing only "to make sure that certain language is not used in the order [granting summary judgment]" because "[Defendants' counsel of record] wants . . . language in [the order] to make sure there's no liability issues [as to Ratiba and Wahid]."  *Id.* at 2:16-21.

[9]  When the Debtor filed this case, it was assigned to the Honorable James M. Peck.  After Judge Peck's retirement effective January 31, 2014, the case was temporarily assigned to the Honorable Robert E. Grossman, sitting by designation in the United States Bankruptcy Court for the Southern District of New York pursuant to an order signed by the Honorable Robert A. Katzmann, Chief Circuit Court Judge for the Second Circuit Court of Appeals.  Judge Grossman presided over this adversary proceeding until it was reassigned to Judge Garrity on February 18, 2015.

behalf of the Debtor's estate, against Ratiba and Wahid, jointly and severally, in the sum of

$705,000. *See* Judgment in Favor of Trustee [AP ECF Doc. No. 50] (the "**Judgment**").

This matter is back before the Court because by order dated July 8, 2015, the District

Court (Gardephe, J.) granted Defendants' petition for a writ of mandamus and directed this Court

to (i) vacate the Decision; (ii) vacate the Judgment; and (iii) issue proposed findings of fact and

conclusions of law with regard to the avoidance claims. *See Salim, et al. v. Nisselson, et al.*, 15

Civ. 4629 (PGG) July 8, 2015 Order [15 Civ. Dkt. No. 20] (the "**July 2015 Order**") at \*9. The

District Court found that this Court exceeded its constitutional authority in entering the

Judgment. Furthermore, it determined that this Court had disregarded the District Court's

directive in its March 25, 2013 Memorandum Opinion and Order (the "**March 2013 Order**")[10]

denying Defendants' motion to withdraw the reference of the Complaint from the Bankruptcy

Court to the District Court (the "**Reference Motion**"), that it not enter a final judgment on the

claims in the Complaint but instead, issue proposed findings of fact and conclusions of law for

review by the District Court. *Id.*

This Court complied with the District Court's order and vacated the Decision and

Judgment. *See Order Vacating (I) Entry of Summary Judgment, And (II) Entry of Final

Judgment* [AP ECF Doc. No. 55]. On December 14, 2015, after receiving additional

submissions from the parties,[11] the Court heard additional argument on the Motion. For the

---

[10] *See Nisselson v. Salim*, 2013 WL 1245548, at \*5 (S.D.N.Y. Mar. 25, 2013) [12 Civ. Dkt. No. 19].

[11] At an October 20, 2015 conference with the parties, this Court granted Defendants' request for leave to
supplement the summary judgment record with a memorandum of law addressing (i) issues related to avoidability of
transfers and *in rem* and/or *in personam* liabilities for an avoided transfer under Bankruptcy Code §550 and (ii) the
issue of whether Defendants are secured creditors of the Debtor. The Court also granted the Trustee the opportunity
to file a reply memorandum of law, if he elected to do so. *See Scheduling Order*, dated October 28, 2015 [AP ECF
Doc. No. 57]. The Defendants timely filed their *Objections By Defendants to Summary Judgement* (the
"**Objection**") including affidavits from Wahid (the "**Wahid Affidavit**") and Ratiba (the "**Ratiba Affidavit**") [AP
ECF Doc. No. 58] and the Trustee timely filed his Reply, respectively.

reasons stated below, the Court files these proposed findings of fact and conclusions of law, recommending that the District Court grant judgment to the Trustee against Ratiba on his First Claim for Relief (the "First Claim"), pursuant to §§ 547(b), 550(a) and 551 of the Code (i) avoiding and preserving the Transfers for the benefit of Big Apple's estate; (ii) directing the Transfers to be set aside; and (iii) recovering the Transfers or value thereof from Ratiba. The Court does not recommend entering judgment against Wahid, as he is not party to the First Claim for Relief. In any event, the Trustee has not established on summary judgment that he is an immediate or mediate transferee of the Transfers and, thus, liable to the Trustee for those transfers, or the value thereof, under § 550(a)(2) of the Code. Accordingly, the Court recommends that the District Court deny the Trustee's request for summary judgment against Wahid on his First Claim for Relief.

**Background**[12]

On March 30, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Code in this Court. *See* Debtor's Voluntary Petition for Relief Under Chapter 11 [ECF Doc. No. 1] (the "**Petition**"). As of the Petition Date, the Debtor owned and operated a Volkswagen dealership and repair business pursuant to a franchise agreement with Volkswagen of America, Inc. Julian was the managing member and 54% equity owner of the Debtor. 7056-1 Statement ¶ 2; s*ee also* Petition, p. 9, *Affidavit Pursuant to Local Bankruptcy Rule* 1007-2, ¶ 2.

Debtor remained in possession and control of its business and assets as a debtor in possession until May 12, 2011, when, on the motion of secured creditor VW Credit, Inc. ("**VW**

---

[12] The underlying facts are not in dispute and many are set forth in the 7056-1 Statement. Defendants did not contest the facts in that statement. As such, those facts are deemed admitted. *See* LBR 7056-1(d); *see also* LCR 56.1(c).

**Credit**") for the appointment of a chapter 11 trustee, the Court directed the appointment of Alan

Nisselson as trustee for the chapter 11 estate. 7056-1 Statement ¶ 2; Trustee Aff. Ex. B (Order

Appointing Chapter 11 Trustee [ECF Doc. No. 61]). Upon the motion of the Trustee, by order

dated December 21, 2011, the Court converted the Debtor's case to a case under chapter 7 of the

Code. 7056-1 Statement ¶ 3. Thereafter, the Trustee was appointed interim Chapter 7 trustee

and is now qualified and serving as permanent trustee. *See* Trustee Aff. Ex. C. (Order

Converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code and Granting

Other Related Relief. [ECF Doc. No. 147]).

This litigation arises out of prepetition transactions among Julian, his mother, and the

Debtor. Pursuant to a letter agreement among them, effective June 1, 2006, Ratiba loaned Julian

and the Debtor $300,000 'to invest in purchasing Big Apple VW LLC." *See* T. Aff. Ex. R

(Letter [AP ECF Doc. No. 39-19]) (the "**Letter Agreement**"). To finance her loan to the

Debtor, Ratiba took out a $300,000 mortgage on the Premises. *See* T. Aff. Ex. Q (Ratiba Salim

Deposition Tr.) at 16:4-20:22. The Letter Agreement calls for the loan to be repaid no later than

April 2011. *Id.* That agreement also obligates the Debtor and Julian to pay Ratiba the sum of

$75,000/year for five years from the Debtor's "yearly profit as promised as a share to Ratiba

Salim for giving Julian and Big Apple VW the loan." *Id*. In total, the Letter Agreement

provides for payments to Ratiba from the Debtor and Julian of $675,000 over the five year

period. *Id.* The agreement does not grant, or purport to grant, Ratiba an interest in any of the

Debtor's property as security for Debtor's obligations under the agreement. *Id.*

During the period of June 2006 – February 2011, the Debtor made no payments to Ratiba

on account of the amounts due and owing to her under the Letter Agreement. *See* T. Aff. Ex. N.

(Julian Salim Deposition Tr.) at 33:22 - 34:12 (Julian confirming that prior to the Transfers,

Ratiba was not paid anything on account of the promised $375,000 in profits.).  However, on

March 16, 2011, the Debtor made the Transfers to Ratiba in full satisfaction of its indebtedness

to her.  *Id*. at 96:8-13 (Julian testified that the Transfers were made in March 2011 because "it

was approaching the five-year agreement that we had with [Ratiba].")  Specifically, that day, the

Debtor wired $495,000 from its bank account (the "**Debtor's Account**") to the Bank Account.

7056-1 Statement ¶ 6.  In addition, on that same day a cashier's check drawn on the Debtor's

Account in the sum of $210,000 was deposited into the Bank Account. 7056-1 Statement ¶ 7.

On March 17, 2011, the sum of $335,160.10 was transferred from the Bank Account to

the Mortgagee in full satisfaction of the Mortgage.[13]  *See* T. Aff. Ex. V (Satisfaction of Mortgage

dated March 23, 2011, and recorded with the Office of the City Register of the City of New York

on April 5, 2011).  *See also* T. Aff. Ex. N. (Julian's Deposition Transcript) at 75:14-22 (Julian

testified that the money that was used to satisfy the mortgage on the Premises was from the same

money transferred to the Bank Account from Big Apple.)

On May 5, 2011, Ratiba transferred title to the Premises – now debt free -- to Wahid.

7056-1 Statement Sec. H.  Although the deed recites that the transfer was made "[i]n

consideration of Ten Dollars ($10.00) and other good and valuable consideration," *see* Trustee

Aff. Ex. W, there is no evidence in the record that any consideration was paid on account of the

transfer.[14]

---

[13]  Specifically, the $335,160.10 payment was made from the Bank Account referencing   "BENEFICIARY RATIBA SALIM 8529 65TH RD REGO PARK NY 11374 [i.e. the Premises]" and "DETAILS ,ATTN PAYOFF DEPT. (sic)".  T. Aff. Ex. M (Account Statement, AP ECF Doc. No. 39-14).

[14]  By Plaintiff's First Requests for Production of Documents, dated November 22, 2011, and directed to Ratiba and Wahid, the Trustee sought "[a]ll Documents concerning the transfer of title to the [Premises] from Defendant Ratiba Salim to Defendant Wahid Saleem."  7056-1 Statement Sec. H; *see also*, T. Aff. Ex. Y, p. 6 ¶ 9.  No party has provided substantiation of any consideration to the Trustee in response to the Document Demand or otherwise.  *See* T. Aff. ¶ 71.

On June 14, 2011, the Trustee brought this adversary proceeding under (i) 11 U.S.C. §§ 544(b), 547(b), 548(a), 550(a) and 551; and (ii) the NEW YORK DEBTOR AND CREDITOR LAW §§ 273-276, 278 and/or 279 against Ratiba and Wahid. Compl. ¶ 3. The Complaint includes nine claims for relief. In Claims for Relief One through Seven, the Trustee seeks to avoid the Transfers and recover them from Ratiba under federal preference and state and federal fraudulent transfer laws.[15] In the Eighth Claim for Relief ("Claim Eight"), the Trustee seeks to avoid Ratiba's transfer of the Premises to Wahid as a fraudulent transfer under state and federal law. In the Ninth Claim for Relief, the Trustee sought attachment of the Premises pursuant to Article 62 of the NEW YORK CIVIL PROCEDURE LAW AND RULES and Rule 64 of the FEDERAL RULES OF CIVIL PROCEDURE. By Order of Attachment dated June 29, 2011, the Court granted the Trustee's *ex parte* application to attach the Premises [AP ECF Doc. No. 5], and by Order Confirming Order of Attachment dated September 15, 2011, the Court confirmed that attachment order. *See* [AP ECF Doc. No. 11].

In support of the First Claim, the Trustee alleges that within one year of the commencement of the case, the Debtor made the Transfers to Ratiba, an insider of the Debtor, on account of a debt then due and owing to her. Compl. ¶¶ 9-22.[16] The Trustee further alleges that the Transfers were made when the Debtor was insolvent and that they enabled Ratiba to recover

---

[15] In the Second and Third Claims for Relief, the Trustee seeks to avoid and recover the Transfers from Ratiba as a fraudulent and constructively fraudulent transfer under §§ 548(a)(1)(A) and (B), respectively. In the Fourth Claim for Relief, the Trustee seeks to avoid and recover the Transfers from Ratiba as a fraudulent transfer under New York Debtor and Creditor Law §§ 273, 278 and/or 279, and Bankruptcy Code §§ 544(b), 550(a) and 551. In the Fifth Claim for Relief, the Trustee seeks to avoid and recover the Transfers from Ratiba as a fraudulent transfer under New York Debtor and Creditor Law §§ 274, 278 and/or 279, and Bankruptcy Code §§ 544(b), 550(a) and 551. In the Sixth Claim for Relief, the Trustee seeks to avoid and recover the Transfers as a fraudulent transfer under New York Debtor and Creditor Law §§ 275, 278 and/or 279, and Bankruptcy Code §§ 544(b), 550(a) and 551. In the Seventh Claim for Relief, the Trustee seeks to avoid and recover the Transfers as a fraudulent transfer under New York Debtor and Creditor Law §§ 276, 278 and/or 279, and Bankruptcy Code §§ 544(b), 550(a) and 551.

[16] The Complaint alleged that the transfers to Ratiba totaled $718,000. Compl. ¶ 1. However, through the Motion the Trustee seeks judgment with regard to transfers of no less than $705,000. *See* 7056-1 Statement, ¶ 9; T. Aff. ¶ 38.

more than she would from a distribution to creditors in this case had the Transfers not been made. Compl. ¶¶ 23-24. The Trustee contends that pursuant to §§ 547(b), 550(a) and 551 of the Code, he is entitled to a judgment against Ratiba: (i) avoiding and preserving the Transfers; (ii) directing that the Transfers be set aside, and (iii) recovering the Transfers, or the value thereof, from Ratiba for the benefit of the estate. Compl. ¶ 25.

## The Summary Judgment Motion

The Trustee contends that he is entitled to summary judgment on the First Claim avoiding and preserving the Transfers for the benefit of the Debtor's estate as preferences under §§ 547(b) and 551 of the Code. *See* T. Memo. 1, 5. He asserts that once those transfers are avoided, under § 550(a), he can recover the value of the Transfers from Ratiba as the initial transferee of the Transfers, and the Subsequent Transfer from Wahid, as the immediate transferee of Ratiba, the initial transferee. *Id.* 15-17. The Trustee asserts that the matter is ripe for summary judgment because there are no material facts in dispute and that as a matter of law he is entitled to the relief he is seeking under §§ 547, 550 and 551 of the Code. *Id.* 17-18.

The Defendants oppose the Motion. They contend that this Court lacks the power to issue proposed findings of fact and conclusions of law in respect of the Motion because only an Article III court can adjudicate the merits of the Motion and they are entitled to a jury trial on the issues underlying the Complaint. Obj. 1-4. They also contend that in filing the Objection, they have not waived their right to have the Motion adjudicated by an Article III court. Obj. 1, n.1. They also contest the merits of the Motion. They contend that the Trustee has failed to state a *prima facie* case for relief under either § 547(b) or § 550(a) of the Bankruptcy Code. They assert that the facts show that at the time of the Transfers, the Debtor was solvent and that Ratiba was a secured creditor of the Debtors. Obj. 4-5. Thus, they argue that the Trustee cannot satisfy §§

10

547(b)(3) and 547(b)(5) of the Code.[17]  Further, they maintain that because Ratiba had no

knowledge of the Transfers and did not control the Bank Account, the Transfers are not

avoidable under § 547.  They also contend that even if the Trustee establishes that the Transfers

are avoidable as preferential transfers, he cannot recover them from Ratiba because she is not an

"initial transferee" of the Transfers under § 550 of the Code, but rather is either a good faith

"subsequent transferee" or a mere conduit of the Transfers.[18]  Obj. 5-9.  Finally, they contend

that Wahid is a *bona fide* interest holder in the Premises because he had no knowledge of the

Transfers.  Obj. 9-10.

## Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material

fact," and the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(a);[19]

*see NML Capital v. Republic of Argentina*, 621 F.3d 230, 236 (2d Cir. 2010) (*citing Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Redd v. Wright*, 597 F.3d 532, 535-36 (2d Cir.

---

[17]  In their Amended Answer to the Complaint, the Defendants asserted an affirmative defense based on the ordinary course of business under 11 U.S.C. § 547(c)(2).  [AP ECF Doc. No. 15, ¶ 77].  The Defendants did not submit any evidence in support of that affirmative defense and did not address it in any manner in the Objection.  Accordingly, for purposes of this Motion, they are deemed to have abandoned it.  *See Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 119 (Bankr. S.D.N.Y. 1997) (deeming unaddressed affirmative defenses as abandoned in granting trustee summary judgment on preference action).

[18]  The Trustee contends that Ratiba and Wahid are the initial and subsequent transferees of the Transfers, respectively.  *See, e.g.*, Compl. ¶¶ 1, 13, 25 (Ratiba as initial transferee) and Compl. ¶¶ 1, 5, 62-65 (Wahid as subsequent transferee); T. Aff. ¶ 3 ("the Trustee is entitled to partial summary judgment . . . (2) avoiding and preserving the transfers to Defendant Ratiba Salim; (3) directing that such transfers be set aside and recovering the transfers, or the value thereof, from Defendant Ratiba Salim for the benefit of the Debtor's estate; and (4) avoiding and recovering the subsequent transfer to Defendant Wahid Saleem as a subsequent transferee of a property transferred to him by Defendant Ratiba Salim.").  Defendants blur that important distinction in the Objection, as they frequently refer to the "Defendants" even as they are discussing matters relating exclusively to Ratiba or Wahid, respectively.  *See, e.g.*, Obj. 5 ("Defendants have no clue about the transaction that went through their bank account"); Obj. 6 ("The defendants are not really transferees or "initial transferees.  If there is any benefit that which inured to them . . . rendering them subsequent transferees . . . .").  In addressing the Objection, and to avoid confusion regarding the claims against Ratiba and Wahid, where necessary, this Court will not lump the Defendants together, but will separately address matters relating to Ratiba and Wahid consistent with the allegations in the Complaint and Motion.

[19]  FED. R. BANKR. P. 7056 makes Rule 56 applicable in bankruptcy cases.

2010)). "An issue of fact is 'genuine' if the evidence is such that a [trier of fact] could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.* (citation omitted).

The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *See NetJets Aviation, Inc. v. LHC Communs.*, LLC, 537 F.3d 168, 178 (2d Cir. 2008) (*citing Liberty Lobby*, 477 U.S. at 255; and *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 162 (2d Cir. 2006) (*quoting Liberty Lobby*, 477 U.S. at 249).  Opposition to a summary judgment motion cannot be based on "conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  Likewise, "mere denials or unsupported alternative explanations of its conduct" will not suffice.  *Senno*, 812 F.Supp.2d at 467 (citing *SEC v. Grotto*, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006)).  Rather, the non-moving party must still come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat a properly supported summary judgment motion.  *Liberty Lobby,* 477 U.S. at 256.  Thus, "[s]ummary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

As explained below, the Court finds that this matter is ripe for summary judgment as there are no material facts in dispute.  Before addressing the merits of the Motion, the Court will address the Defendants' contentions regarding the scope of this Court's power to resolve the Motion.

### Discussion

**Whether the Bankruptcy Court Has the Power to Issue Proposed**
**Findings of Fact and Conclusions of Law in Resolution of the Motion**

The Court acknowledges that in filing the Objection the Defendants did not waive their right to have the Motion resolved in an Article III tribunal.  Indeed, the District Court confirmed that right when it denied the Reference Motion, and reinforced Defendants' right of access to an Article III tribunal when it granted Defendants' petition for a writ of mandamus.  *See* March 2013 Order at *12-14; July 2015 Order at *6-9.  However, there is no merit to Defendants' challenge to this Court's power to issue proposed findings of fact and conclusions of law in addressing the Motion.

In denying the Reference Motion, the District Court applied the teachings of *Stern v. Marshall*, 564 U.S. 338 (2011), to the facts of this case, and found that this Court "lacks constitutional authority to enter a final judgment on [the Trustee's] avoidance claims because although they may be core bankruptcy matters [under 28 U.S.C. §§ 157(b)(2)(F) and (H)] they concern private rights."  *Nisselson v. Salim*, 2013 WL 1245548 at *5.  Nonetheless, the Court found that the Bankruptcy Court "may still hear the case in the first instance and recommend proposed findings of fact and conclusions of law."  *Id*. (quotation marks and citation omitted).

It is now settled that in a matter like this, involving the adjudication of so-call "*Stern* claims" (*i.e.*, otherwise "core" claims as to which bankruptcy courts lack final adjudicatory authority) when the parties do not consent to the Bankruptcy Court's final adjudication of the

matter, that the court must treat the matter as if it was a non-core "related to" matter under 28

U.S.C. § 157(c), thereby leaving final adjudication to the District Court. *See Executive Benefits*

*Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2168 (2014) ("[W]hen under *Stern's* reasoning, the

Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related

claim, [28 U.S.C. § 157(c)] permits a bankruptcy court to issue proposed findings of fact and

conclusions of law to be reviewed *de novo* by the district court."); *see also Residential Funding*

*Co., LLC v. UBS Real Estate Securities, Inc.*, 2015 WL 1062264, at *3, 6 (S.D.N.Y. March 6,

2015) (denying motions to withdraw reference and appeal bankruptcy court denial of motion to

remand and declaring "action will remain before the Bankruptcy Court to issue, as necessary,

proposed findings and conclusions for *de novo* review by [the District] Court."); *Messer v.*

*Bentley Manhattan Inc. (In re Madison Bentley Assoc., LLC)*, 474 B.R. 430, 437 (S.D.N.Y.

2012) (declining motion to withdraw reference post-*Stern* to non-consenting defendants

involving core claims and holding that bankruptcy court would "continue proceedings and

submit a report and recommendation to [the District] Court").[20]  Here, the Defendants do not

consent to this Court's resolution of the avoidance actions.  Accordingly, by application of §

---

[20] The *Amended Standing Order of Reference*, M10-468 of the U.S. District Court for the Southern District of New York, states in relevant part:

> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district law.

*Amended Standing Order of Reference*, M10-468, (S.D.N.Y. January 31, 2012) (Preska, C.J.).  *See also* LBR 9033-1 ("If the Court determines that it cannot enter a final order or judgment consistent with Article III of the United States Constitution in a particular proceeding referred to the Court and designated as core under section 157(b) of title 28, and the Court hears the proceeding, Rule 9033(a), (b), and (c) of the Federal Rules of Bankruptcy Procedure shall apply as if it is a non-core proceeding.").  Thus, this Court is required, under the March 2013 Order, the July 2015 Order, the *Amended Standing Order of Reference*, our Local Rules, and applicable case law, to issue these proposed findings of fact and conclusions of law, and does so consistent with that requirement.

157(c)(1), the District Court, after *de novo* review of this Court's proposed findings of fact and conclusions of law, will resolve the Motion.[21]

Defendants' assert that they are entitled to a jury trial on the Complaint.  Obj. 1.  That assertion also does not detract from this Court's power to issue proposed findings of fact and conclusions of law to resolve the Motion.  The right to a jury trial is implicated only if the party survives a dispositive motion, such as a summary judgment motion.  "[W]here no issue of fact remains, summary judgment decides only questions of law and does not deprive the losing party of its jury trial right." *Benjamin v. Traffic Executive Ass'n E.R.R.,* 869 F.2d 107, 115 n.11 (2d Cir.1989), (quoting *Itel Capital Corp. v. Cups Coal Co., Inc.,* 707 F.2d 1253, 1261 (11th Cir.1983)).[22]

The Court now turns to the merits of the Motion.

**<u>Whether the Transfers Are Avoidable Under § 547</u>**

Section 547 of the Code states in relevant part that a trustee may avoid any transfer of an interest of a debtor in property--

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such
         transfer was made;

    (3) made while the debtor was insolvent;

---

[21] Defendants' challenge to the Court's power to issue proposed findings of fact and conclusions of law for *de novo* review by the District Court not only ignores well settled law, the *Amended Standing Order of Reference* and the Court's own Local Rule, but is also contrary to the position they took in their *Petition for Writ of Mandamus and/or Prohibition*.  There, among other things, the Defendants asked the District Court to direct "the bankruptcy judge to submit proposed findings of fact and conclusions of law, pertaining to the adversary proceeding, to the [D]istrict [C]ourt for a de novo hearing."  *See e.g.*, *Petition for Writ of Mandamus and or Prohibition*, 15 Civ. Dkt. No. 5, at 1 and at 22, 27, and 30-31.

[22] The Trustee asserts that the Defendants waived "any right [the Defendants] had to a jury trial" because they did not assert those rights in a timely manner under FED. R. CIV. P. 38.  Reply 9.  That matter is not currently before the Court, however, and we do not address it herein. Neither the Trustee nor the Defendants have filed a motion or otherwise sought procedurally proper relief concerning any jury rights the Defendants may have with regard to the issues raised in the Complaint.

> (4) made –
>> (A) on or within 90 days before the date of the filing of the petition, or
>> (B) between ninety days and one year of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if--
>> (A) the case were a case under chapter 7 of [the Bankruptcy Code];
>> Code];
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

11 U.S.C. § 547(b).  Pursuant to § 547(g), the Trustee bears the burden of proving the avoidability of a transfer.  11 U.S.C. § 547(g); *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 342 (Bankr. S.D.N.Y. 1999).  That burden is satisfied by a preponderance of the evidence. *See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 34 (2d Cir. 1996); *G.G. Survivor Creditor Corp. v. Harari (In re G. Survivor Corp.)*, 217 B.R. 433, 440 (Bankr. S.D.N.Y. 1998).  If the Trustee "puts forth sufficient proof to establish a *prima facie* preference, the burden shifts and the creditor is given the opportunity to establish by a preponderance of the evidence that one of the enumerated exceptions in 11 U.S.C. § 547(c) applies."  *Child World, Inc. v. Service Merchandise Co., Inc. (In re Child World, Inc.)*, 173 B.R. 473, 476 (Bankr. S.D.N.Y. 1994).  As set forth below, the Court recommends finding that the Trustee has met his burden on each element of section 547(b) and that there is no merit to the Defendants' contentions to the contrary.  Likewise, Defendants have not asserted any defenses under §547(c) of the Code, and the factual issues they have raised, and which are described below, do not preclude entry of summary judgment because they do not rise to the level of presenting any genuine dispute to material facts.

As a preliminary matter and before considering application of the elements of § 547(b) to the facts of this case, the Court considers whether the Transfers were of "an interest of the debtor

in property." 11 U.S.C. § 547(b).  The Code does not define that term.  However, in *Begier v.*

*IRS*, the Supreme Court observed that

> [b]ecause the purpose of the avoidance provision is to preserve the property
> includable within the bankruptcy estate – the property available for distribution to
> creditors – 'property of the debtor' subject to the preferential transfer provision is
> best understood as that property that would have been part of the estate had it not
> been transferred before the commencement of bankruptcy proceedings.

496 U.S. 53, 58 (1990).  *See also Glinka v. Bank of Vermont (In re Kelton Motors, Inc.),* 97 F.3d

22, 25 (2d Cr. 1996) ("Thus the trustee may only seek to reach those legal and equitable interests

that the debtor would have held at the time of the petition but for debtor's transfer of those

interests."); *In re Southmark Corp. v. Grosz (In re Southmark Corp.)* 49 F.3d 1111, 1116 -1117

(5th Cir. 1995) ("[T]he primary consideration in determining if funds are property of the debtor's

estate is whether the payment of those funds diminished the resources from which the debtor's

creditors could have sought payment.").   Estate property consists of "all legal or equitable

interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

It is undisputed that on March 16, 2011, the Debtor made two transfers aggregating

$705,000 (i.e. a wire transfer of $495,000 and bank deposit of $210,000) from the Debtor's

Account to the Bank Account.  7056-1 Statement ¶¶ 5-9; T. Aff. ¶¶ 27-42; *see also* T. Aff. Ex J

and K (the face of each bank record evidencing the origination of transferred funds shows "Big

Apple Volkswagen, LLC" as the "account owner.").  Those funds would have been part of Big

Apple's estate on the Petition Date had they not been transferred to Ratiba.  *See McHale v.*

*Boulder Capital LLC (In re 1031 Tax Group, LLC)*, 439 B.R. 47, 70 (Bankr. S.D.N.Y. 2010)

("money in a bank account in the name of a debtor is presumed to be property of the bankruptcy

estate.") (citation omitted); *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cuter, P.A. (In*

*re USA Diversified Prods., Inc.)*, 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor . . .

17

includes the interest that a depositor the debtor has in the money in his account, more precisely the money owed him by the bank by virtue of the account."); *Southmark,* 49 F.3d at 1116-17 (payment to employee from debtor's checking account which contained "commingled funds" as part of a cash management system, when debtor held "complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors," held to be property of the debtor's estate for § 547(b) purposes because estate was diminished and because debtor controlled funds in the account). The Defendants do not contend otherwise. The Trustee has established the Transfers were of an interest of the Debtor in property.

The Court now considers the application of § 547(b) in this case.

## Whether the Transfers Were To or For the Benefit of a Creditor

Section 101(10) of the Bankruptcy Code defines a "creditor," in part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Under the Letter Agreement, Ratiba had a "right to payment" on account of both the loan and the promised profit sharing payments. *See* Letter Agreement. Ratiba does not dispute that she was a creditor of the Debtor when the Debtor made the Transfers. The Transfers were to or for the benefit of Ratiba, a creditor, and, thus, the Trustee has satisfied §547(b)(1).

## Whether the Transfers Were On Account of Antecedent Debt
## Owed By the Debtor Before Such Transfer Was Made

For purposes of section 547(b)(2) of the Code, an "antecedent debt" is "a debt which is incurred prior to the relevant transfer." *See Pereira v. Lehigh Savings Bank, SLA (In re Artha*

*Management, Inc.*), 174 B.R. 671, 678 (Bankr. S.D.N.Y. 1994) (*citing In re Intercontinental*

*Publications, Inc.,* 131 B.R. 544, 549 (Bankr. D. Conn. 1991)).  For these purposes, a debt is

incurred "when it arises and not when payment is due."  *In re Schick*, 234 B.R. at 347.  There is

no dispute that under the Letter Agreement, Debtor's obligation to repay the loan and to make

the profit sharing payments arose when the parties executed the letter and Ratiba funded the loan.

It is further undisputed that none of that indebtedness had been satisfied as of the date Debtor

made the Transfers to Ratiba.  Thus, the Trustee has met his burden to establish that the

Transfers were on account of antecedent debt under § 547(b)(2).

**<u>Whether The Transfers Were Made While the Debtor Was Insolvent</u>**

Section 101(32) of the Code defines insolvency as a "financial condition such that the

sum of [an] entity's debts is greater than all of such entity's property at fair valuation . . . ."  11

U.S.C. §101(32).  Thus, the Code uses a "balance sheet" test to establish insolvency in a

preference action under § 547.  *See In re Taxman Clothing Co., Inc.*, 905 F.2d 166, 170 (7th Cir.

1990) ("balance-sheet solvency determines whether the payments to creditors [are] voidable

preferences).  Pursuant to § 547(f) of the Code, the "debtor is presumed to have been insolvent

on and during the 90 days immediately preceding the date of the filing of the petition."  11

U.S.C. § 547(f).  The presumption does not shift the burden of proof; it allocates to the creditor

"the burden of going forward with evidence."  5 COLLIER ON BANKRUPTCY ¶ 547.03[5], p. 547-

33 (16th ed. 2015) (hereinafter COLLIER).  "To rebut a presumption of insolvency, a creditor

must introduce 'some evidence that the debtor was not in fact insolvent at the time of the

transfer.'"  *Cellmark Paper Inc. v. Ames Merchandising Corp. (In re Ames Dep't Stores, Inc.)*,

506 Fed. Appx. 70, 72 (2d Cir. 2012) (quoting *Roblin,* 78 F.3d at 34, and finding that bankruptcy

court was not clearly erroneous in concluding that book value evidence, combined with

19

unsupported statements by company executives on anticipated future post-bankruptcy

performance, was insufficient to overcome insolvency presumption).  *See also* Rule 301 Federal

Rules of Evidence ("In a civil case, unless a federal statute or these rules provide otherwise, the

party against whom the presumption is directed has the burden of producing evidence to rebut

the presumption.  But this does not shift the burden of persuasion, which remains with the parties

who had it originally.")

Although the Defendants raise the issue of the § 547(f) presumption and correctly state

that it is rebuttable, *see* Obj. 2 n.2, they offer no evidence regarding the Debtor's financial

condition.[23]  The only mention in the Objection about the Debtor's solvency is Defendants' bare

assertion that "[t]he debtor was not insolvent at the time of [the [T]ransfer[s].  The [Debtor] had

value exceeding its liabilities.  It is matter [sic] not for summary judgment."  Obj. 2.  That

conclusory and unsupported statement regarding the Debtor's solvency does not rebut the

presumption.  *See Marino v. Chrysler Credit Corp. (In re Marino)*, 201 B.R. 234, 248 (Bankr.

N.D. Ill. 1996) ("More than a mere denial of insolvency is required to overcome this

presumption.").[24]  *See also In re Alithochrome Corp.*, 53 B.R. 906, 912 (Bankr. S.D.N.Y. 1985)

("defendant's general denial of insolvency . . . is inadequate to rebut the plaintiff's allegation that

the debtor was insolvent").   Therefore, the Trustee is entitled to rely on that unrebutted

---

[23]  Neither the Ratiba Affidavit nor the Wahid Affidavit put forth in support of the Objection address the Debtor's
financial condition in any manner.  Additionally, the Defendants point to no other evidence in the record before the
Court on this issue.

[24]  The Defendants' citation to *Taxman* and *Clay v. Traders Bank of Kansas City*, 708 F.2d 1347 (8th Cir. 1983)
does not further their cause.  *Taxman* makes clear the maxim that "[t]he defendants [have] the burden of producing
evidence [of solvency]" in order to rebut the § 547(f) presumption of insolvency for the 90 day period prior to the
debtor's filing date.  *Taxman*, 905 F.2d at 168.  Their reliance on *Clay v. Traders Bank of Kansas City* is equally
unavailing.  That case involved, in part, a dispute on appeal over the amount of evidence a defendant needed to
introduce in order to rebut the § 547(f) presumption.  708 F.2d at 1351 ("Regardless of whether the district court
erroneously applied the substantial evidence test or correctly required [the defendant] to show only *some evidence* of
insolvency . . . .") (emphasis added).  Both cases support the general proposition that a defendant must put forth at
least some evidence of solvency in order to rebut the presumption. The Defendants have failed to do so in this case.

presumption and need make no further showing on the issue. *Id.* ("[Movant] need not present evidence of insolvency unless the defendant comes forward with some evidence to rebut the presumption."); *Pan Am. World Airways, Inc. v. Care Travel Co. Ltd. (In re Pan Am Corp.)*, 138 B.R. 382, 388 (Bankr. S.D.N.Y. 1992) ("[Defendant] has not presented this Court with information sufficient to rebut the statutory presumption. The third element of the preference action has accordingly been met in that Pan Am was insolvent when it transferred the subject funds."); s*ee also, Marino*, 201 B.R. at 248 ("[defendant] has failed to present any evidence to overcome the statutory presumption of insolvency. . . . Thus, on the present record, [plaintiff] has established [insolvency]"). On a motion for summary judgment "the presumption [of insolvency] has the same effect it would otherwise have." *Alithochrome*, 53 B.R. at 912 (citation omitted).

The Trustee has satisfied his burden with respect to 11 U.S.C. § 547(b)(3).

**Whether the Transfers Were Made on or Within**
**The 90 Days before the Date of the Filing of the**
**Petition or Between 90 Days and One Year Before**
**The Petition Date If Transferee Was an Insider**

The Transfers were made on or about March 16, 2011, which is a date within two weeks of the Petition Date. *See* 7056-1 Statement ¶¶ 6-9. That clearly falls within the 90 day period immediately prior to the Petition Date. Accordingly, the Trustee has met his burden under § 547(b)(4).[25]

---

[25] As noted, Ratiba is Julian's mother and Julian was a managing member and 54% owner of the Debtor. 7056-1 Statement ¶ 5. Julian was also the president of the Debtor. *See* Trustee Aff. Ex. I (Statement of Financial Affairs, 21b) [AP ECF Doc. No. 39-10]. Accordingly, Ratiba was an "insider" of the Debtor. *See* 11 U.S.C. § 101(31)(B)(ii) (Where debtor is a corporation, the term "insider" includes a "relative of a general partner, director, officer or person in control of the debtor."). *Id.* § 101(45) ("The term 'relative' means individual related by affinity or consanguinity within the third degree as determined by common law, or individual in a step or adoptive relationship within such third degree."). Ratiba's status as an "insider" does not, however, impact the analysis of the timing of the Transfers because they both occurred well within the 90 days immediately preceding the Petition Date.

**Whether Receipt of the Transfers Enabled Ratiba to Receive More than
She Would Have Received Through a Hypothetical Chapter 7 Liquidation**

"To satisfy § 547(b)(5), the plaintiff must prove that the transferee received more as a

result of the preference than if the preference was never paid, and instead, the transferee received

a distribution on its claim in a hypothetical chapter 7 case." *Savage & Assocs. v. Mandl (In re

Teligent Inc.),* 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). "As a practical matter, this element is

satisfied whenever the plaintiff shows that the creditor would receive less than 100% in a

hypothetical chapter 7 distribution." *Id.* (citations omitted).  The Trustee contends that he has

met his burden here because the evidence shows that (i) VCI holds a valid claim in excess of

$1.1 million; (ii) that claim is secured by a perfected first priority lien on Debtor's assets; (iii)

Debtor's assets currently total less than $1.1 million; and (iv) unsecured creditors are expected to

receive less than 100% on account of their claims because, after payment of administrative

expenses, the balance of the estate remains subject to VCI's secured claim.  7056-1 Statement ¶¶

17-18.

Nonetheless, Defendants assert that the Trustee has not met his burden because Ratiba

was a secured creditor as of the Petition Date.  *See, e.g.,* Obj. 2 ("Julian further had a UCC lien

executed in favor of his mother, Ratiba Salim.  Thus Ratiba Salim perfected lien at the time of

[sic] debtor sought bankruptcy protection.  The blanket lien was on all assets of the debtor."

(Citation omitted)).[26]  The Letter Agreement, however, does not grant or purport to grant Ratiba

---

[26] It is settled that "[u]nder § 547(b), a transfer to a fully secured creditor is immunized from preference attack
because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization
on its collateral." *Gallagher v. Gordon,* 2010 WL 1816643, at *5 (W.D.N.Y. May 3, 2010).  In asserting that Ratiba
was a secured creditor, the Defendants do not contend that the Trustee has failed to establish the elements of §
547(b)(5).  Rather, without citing to § 547(c)(5), they  seem to invoke that section's "improvement of position test."
*See* Obj. 5 ("Here even its clear that there was a perfected security interest of Ms. Ratiba Salim.  And once it is
determined that the creditor holds a perfected security interest in inventory of receivables or proceeds of either, it
must be determined whether there has been improvement in the creditor's secured position during the preference
time or the date on which the new value was first given a[s] compared to the creditor's secured positon on the date

an interest in any of the Debtor's property as security for Debtor's obligations under that

agreement.  To establish that Ratiba was a secured creditor, Defendants rely on an abstract of a

UCC-1 financing statement which lists: (i)  Ratiba and Big Apple as Secured Party and Debtor,

respectively, (ii) an Original Filing Date of January 28, 2008, and (iii) collateral consisting of

"all assets", including "chattel paper" and "all inventory . . . equipment . . . fixtures . . . computer

equipment . . . account(s) . . . [and] general intangibles."  *See* Obj., Ex. A.  Defendants do not

specify the amount of Ratiba's secured claim, although they seem to contend that it was at least

$300,000.  *See* Obj. 4 (Arguing that Trustee's contention that the Transfer was in satisfaction of

an unsecured loan by Ratiba "is patently false, especially in light of the fact that there is UCC

lien, a perfected one.").  Defendants have failed to establish that Ratiba was a secured creditor

because a financing statement is not sufficient, in and of itself, to prove that she was a secured

creditor and they have adduced no other evidence in support of their contention.  A security

interest attaches to collateral and is enforceable only if the debtor has authenticated a security

agreement that provides a description of the collateral.  *See* N.Y. U.C.C. § 9-203(b)(3)(A)

(McKinney 2015) (hereinafter N.Y. U.C.C.).[27]  *See also Ultimore, Inc. v. Bucala (In re Bucala)*,

464 B.R. 626, 629-31 (Bankr. S.D.N.Y. 2012) (finding that a promissory note and contract

signed by the defendant, when read together, included references to the creditor being secured,

---

of the bankruptcy petitions . . . . These issues are not for summary judgment.") (Citations omitted).)  Section 547(c)(5) is aimed at secured creditors holding a 'floating lien' on a debtor's inventory and receivables. *See generally* 5 COLLIER ¶ 547.04[5].  That subsection excludes from avoidance liens placed on a debtor's inventory or accounts receivable, so long as the lien did not improve the creditor's position during the statutory test period. *Braunstein v. Karger (In re Melon Produce, Inc.),* 976 F.2d 71, 75 (1st Cir.1992).  As Defendants have failed to adduce any evidence in support of their assertion that Ratiba was a secured creditor, the Court will not further consider application of § 547(c)(5) in this case.

[27]  Under the NEW YORK UNIFORM COMMERCIAL CODE, a "[s]ecured party" is "a person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding." N.Y. U.C.C. § 9-102(a)(73)(A).

described the collateral and expressed the "present intent to create a security agreement" was

sufficient to establish the existence of a security agreement). A "[s]ecurity agreement" is "an

agreement that creates or provides for a security interest." N.Y. U.C.C. § 9-102(a)(74).

Standing alone, however, a standard form financing statement, i.e., a UCC-1, does not constitute

a security agreement. *In re Modafferi*, 45 B.R. 370, 372 (Bankr. S.D.N.Y. 1985) (citations

omitted). That is because "[t]he purpose of filing a financing statement is to put third parties on

notice that the secured party who has filed it may have a perfected security interest in the

collateral described." *Ultimore, Inc.,* 464 B.R. at 632 (internal quotation marks and citations

omitted). The only writing evidencing Ratiba's claim is the Letter Agreement. It does not

qualify as a security agreement because it does not purport to create or provide for a security

interest in the Debtor's property. *See* 7056-1 Statement ¶ 12; T. Aff. Ex. R. Moreover, the

UCC-1 (i) is too far removed in time from the Letter Agreement, (ii) is not signed by the Debtor,

and (iii) does not reference the Letter Agreement. Thus, it cannot qualify as a security agreement

whether standing alone, or with the Letter Agreement.

The Trustee has met his burden under § 547(b)(5).[28]

**Defendants' Assertion that Ratiba Lacked Knowledge of the Bank Account
And Transfers Is Not a Defense to the Trustee's Claim for Relief under Section 547**

Defendants seem to contend that even if the Trustee meets his burden under §547(b), he

cannot avoid the Transfers because Ratiba had no knowledge of the existence of the Bank

---

[28]  However, even assuming, *arguendo*, that the Defendants could prove that Ratiba had a perfected security interest in the Debtor's assets, they would not defeat the Trustee's Motion since the uncontroverted evidence establishes that the lien would be subordinate to VCI's first priority lien, and the estate assets are not sufficient to satisfy VCI's claim.

Account or the Transfers and another son, Joseph Salim, controlled the account. Opposition 5-7.[29] In support, Defendants submitted the Ratiba Affidavit in which she states, in part:

> I am told that there is a bank account in my name. I am not sure how it was opened. I do not know how to use the bank. I do not use any card. I do not understand English. Now I am told that money was put in my name. I did not put it. I do not manage any account. My children take care of me . . . . I do not know if there was any money in my account.

Obj. Ex. B, at 1 [AP ECF Doc. No. 58-2]. However, beyond that, they offer no evidence in support of those allegations. There is no question that the Bank Account was maintained in Ratiba's name and listed the address of the Premises, her home address. T. Aff. Ex. M [AP ECF Doc. No. 39-14]. As such, she was the account owner. *See G.K. v. L.K.*, 27 Misc.3d 1239(A), *6 (N.Y.Sup., May 17, 2010) (finding that bank statements in husband's name that included his home address supported conclusion that husband owned bank accounts). Additionally, even though Ratiba repeatedly claims that she has no knowledge of how banking works or having the Bank Account, she never actually disclaims ownership of that account.[30] The Defendants' unsupported statement that Joseph controlled the Bank Account and Ratiba's bald denial of knowledge of the Bank Account do not create a genuine dispute supporting the Defendants' theory that lack of specific knowledge of the Transfers insulates them from liability. *See, e.g., Goenaga v. March of Dimes Birth Defects Fund,* 51 F.3d 14, 18 (2d Cir. 1995) (To defeat a

---

[29] Defendants have not clearly articulated that argument. However, for the sake of completeness, and construing Defendants' arguments in the light most favorable to them, the Court considers whether Ratiba's alleged lack of knowledge of the facts surrounding the Transfers bars a finding that the Transfers are avoidable under § 547. Below, the Court also considers whether Ratiba's alleged lack of knowledge of the Bank Account and Transfers impacts whether she can be held accountable for the Transfers under § 550(a) of the Code.

[30] In fact, on several occasions the Defendants, which under their own definition includes Ratiba, identify that account as "their" account. *See, e.g.,* Obj. 8 ("it is true that money technical was routed through *the defendants account* . . . ." (emphasis added) and "In this case, *the bank account of the mother, the defendant* had been used by a third party and even by the defendant . . . ." (emphasis added), "the lack of knowledge of the bank account and its operation, *the account of the mother* . . . ." (emphasis added); and Obj. 9 "[n]either Ratiba nor Wahid knew about the impugned transfer of monies from the debtor to *Ms. Ratiba's bank account*." (emphasis added). The Ratiba Affidavit also states that "I am told that there is a bank account in my name. . . .I am not sure how it was opened. . . . I do not know if there was any money in *my account*." Ratiba Aff. 1 [AP ECF No. 58-2, p. 3] (emphasis added).

motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise); *Senno,* 812 F.Supp.2d at 467 (A summary judgment motion cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts).

Moreover, even assuming, *arguendo*, that the Defendants could establish that Ratiba did not know that the Bank Account existed or that the Debtor had transferred $705,000 to the Bank Account in satisfaction of its indebtedness to her, that would not bar the Trustee from avoiding the Transfers as preferences. Section 547 of the Code "advance[s] 'the prime bankruptcy policy of equality of distribution among creditors of the debtor' and 'discourage[s] a race by the creditor to collect payment while the debtor is still marginally solvent, or a race to the courthouse to force the debtor into bankruptcy.'" *Corporate Food Management, Inc. v. Suffolk Community College (In re Corporate Food Management Inc.)*, 223 B.R. 635, 641 (Bankr. E.D.N.Y. 1998) (*quoting Child World,* 173 B.R. at 476). *See also* Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713, 748 (1985) ("The function of the preference concept is to avoid prebankruptcy transfers that distort the bankruptcy policy of distribution. Transfers that do distort this policy do so without regard to the state of mind of either the debtor or the preferred creditor.") Thus, "any creditor that received a greater payment than others of its class may be required to disgorge the payment so that all [class members] may share equally." 5 COLLIER ¶ 547.01, p. 547–9. In that way, section 547(b) is a "no fault" provision; a creditor's knowledge, intent and state of mind are irrelevant in determining whether a transfer is avoidable under section 547(b). *See In re AppOnLine.com, Inc.,* 315 B.R. 259, 271 (Bankr. E.D.N.Y. 2009) (Rather, "[b]ecause a 'preference is an infraction of the rule of equal distribution among all creditors,' ... neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b).") (citations omitted). *See also Barash v. Public Finance*

26

*Corp.*, 658 F.2d 504, 510 (7th Cir. 1981) (creditor's knowledge or state of mind is not relevant to preference analysis).[31]   As succinctly stated by COLLIER, in determining whether a transfer is avoidable as a preference, "it is the *effect* of the transaction, rather than the debtor's or creditor's *intent,* that is controlling." 5 COLLIER ¶ 547.01, p. 547–10 (emphasis original) (footnote omitted).

Based on the foregoing, the Court recommends finding that the Trustee has established that he is entitled to summary judgment avoiding the Transfers under § 547 and preserving them

---

[31] The *Barash* court considered the question of whether a creditor's knowledge of the debtor's financial condition was relevant in connection with the assertion of an affirmative defense under section 547(c).  The court explained

> The short answer to this argument is that the creditor's knowledge or state of mind is no longer relevant. Under the predecessor to § 547 (§ 60 of the Bankruptcy Act of 1898), the Trustee had to establish that the creditor had 'reasonable cause to believe' that a debtor was insolvent before a transfer could be avoided. Congress eliminated this requirement in favor of the objective criteria under the new Code. As noted in Collier,
>
> > intent or motive is not a material factor in the consideration of an alleged preference under s 547. Generally speaking, it is the effect of a transaction, rather than the debtor's or creditor's intent, that is controlling.
>
> 4 Collier P 547.01 at 547.12. (emphasis in original.)
>
> The legislative history of § 547 supports this view. The 'reasonable cause to believe' requirement served the primary purpose of the former statute of preventing the 'race of diligence.' But 'a creditor's state of mind has nothing whatsoever to do with the policy of equality of distribution....' H.R.Rep.No.95-595, *supra*, at 178, 5 U.S.Code Cong. & Admin.News at 6139. Appellee's position ignores this important and fundamental goal of the preference section under the Code. In revising the Code, Congress also sought to simplify the complex preference provisions and their interpretations under former law. *Id.* at 179, 5 U.S.Code Cong. & Admin.News at 6140. It is in this context that we must interpret the language of § 547(c)(2). Construing 'incurred' to mean when a debtor first becomes legally bound to pay comports not only with the plain meaning of the word but also with the fundamental policy of equality of distribution.
>
> We do not denigrate the importance of deterring the 'race to the courthouse.' But this purpose behind § 547 does not conflict with the fundamental goal of equality of distribution. Rather, the drafters of the Code envisioned the deterrence of the 'race of diligence' as furthering the more important goal of equal sharing of assets among creditors. *Id.* at 177-78, 5 U.S.Code. Cong. & Admin.News at 6138. The § 547(c)(2) exception protects only those normal transactions which open and close within 45 days, regardless of the knowledge of the creditors or the current status of installment debts.

658 F.2d at 510.

for the benefit of the estate under § 551 of the Code.[32]   Accordingly, the Court now considers the

Trustee's right to recover the Transfers from Ratiba and/or Wahid.

## Whether the Trustee Can Recover the Transfers from Ratiba and/or Wahid

Avoidance and recovery of preferential transfers "are distinct concepts and processes."

*Suhar v. Burns (In re Burns),* 322 F.3d 421, 427 (6th Cir. 2003).  The effect of § 547 is to nullify

the preferential transfer so that the "transferred property becomes a part of the estate

automatically."  *Congress Credit Corp. v. AJC Int'l,* 185 B.R. 555, 558 (D.P.R. 1995).  "A

recovery, on the other hand, forces the transferee to return the property or become personally

liable for its value." *Id.* (Citation omitted).  That can only be accomplished by application of §

550 of the Code.  *See* 11 U.S.C. § 550.  *See*, *e.g., SIPC v. Stratton Oakmont, Inc.,* 234 B.R. 293,

312 (Bankr. S.D.N.Y. 1999) ("Once the grounds for setting aside a transfer have been shown, the

Trustee faces the second hurdle of establishing a means of recovery under § 550(a), the remedies

section, which requires the Trustee to identify a specific category of persons from whom

recovery of the fraudulent transfer may be had.").  The purpose of § 550 of the Code is "to

restore the estate to the financial condition it would have enjoyed if the transfer had not

occurred*." Hirsch v. Gersten (In re Centennial Textiles, Inc.),* 220 B.R. 165, 176 (Bankr.

S.D.N.Y. 1998).

In relevant part, § 550(a) states:

[T]o the extent that a transfer is avoided under section … 547 … of this title, the
trustee may recover, for the benefit of the estate, the property transferred, or, if the
court so orders, the value of such property from –

(1) the initial transferee of such transfer or the entity for whose benefit such
    transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

---

[32] Under § 551 of the Code, "[a]ny transfer avoided under section  . . . 547 . . .of this title . . . is preserved for the
benefit of the estate but only with respect to property of the estate.   11 U.S.C. § 551.

11 U.S.C. § 550(a).  Thus, under this section, once a transaction has been avoided, the estate may recover the transfer or the value thereof from the initial transferee, the party for whose benefit the initial transfer was made, and/or any immediate or mediate (i.e. subsequent) transferee.  *See Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.d 52, 56 (2d Cir. 1997); *In re Teligent, Inc.*, 307 B.R. 744, 749 (Bankr. S.D.N.Y. 2004).  Whether a transferee under §550(a) is an initial or subsequent transferee or is just the entity who benefitted from the avoided transfer, significantly impacts the transferee's liability for the transfer.  Under § 550(a)(1), the "initial transferee" or the "entity for whose benefit the transfer was made" is strictly liable for an avoided transfer.  *See Red Dot Scenic Inc. v. Tese-Milner (In re Red Dot Scenic, Inc.),* 351 F.3d 57, 58 (2d Cir. 2003) (*per curiam*). *See also Rupp v. Markgraf,* 95 F.3d 936, 938 (10th Cir. 1996) (The trustee "may always recover from the initial transferee regardless of [the transferee's] good faith, value, or lack of knowledge of the voidability of the transfer."); *Richardson v. FDIC (In re M Blackburn Mitchell, Inc.)*, 164 B.R. 117, 125 (Bankr. N.D.Cal. 1994) ("Under §550 of the Bankruptcy Code, it is crystal clear that even the 'innocent' initial transferee is liable for the fraudulently transferred funds.") (citation omitted).   In contrast, § 550(b) affords subsequent transferees a defense to liability.  A trustee may not recover an avoidable transfer from a subsequent transferee "that takes for value, including satisfaction or securing an antecedent debt, in good faith, and without knowledge of

the voidability of the transfer." 11 U.S.C. § 550(b)(1). [33] *See Stratton Oakmont,* 234 B.R. at 312

("[L]iability to a subsequent transferee is not strict but subject to the 'good faith purchaser for

value' defense contained in §550(b).") (citations omitted). *Cf. Danning v. Miller (In re Bullion*

*Reserve of North America)*, 922 F.2d 544, 547 (9th Cir. 1991) ( "The 'good faith' defense of

section 550(b) does *not* apply to the 'initial transferee' of the debtor or the 'entity for whom such

transfer was made' and the transferee's power to recover from these entities is absolute.")

(emphasis original).

### Ratiba Salim

The Trustee contends that as the "initial transferee" of the Transfers, Ratiba is strictly

liable to the estate under § 550(a)(1) of the Code.  Reply 5.  Defendants dispute that assertion

principally on the ground that Joseph, not Ratiba, controlled the Bank Account and that Ratiba

had no knowledge of the Transfers.  Obj. 6.  They also contend that "if any benefit [from the

Transfers] inured to [Ratiba] it has gone indirectly (via-a-vis removal of indebtedness toward the

mortgage bank), rendering [her a] subsequent transferee[], deeming [her], still indirectly, as

'accept[ing] the transfer for value, in good faith and without knowledge of the transfer's

voidability.'" *Id.*  Moreover, they maintain that Ratiba cannot be held accountable for the

Transfers because she lacked dominion and control over the Transfers and was a "mere conduit"

---

[33] Section 550(b)(1) states, as follows:

> The trustee may not recover under (a)(2) of this section from –
>
>> (1) a transferee that takes for value, including satisfaction or security of a
>> present or antecedent debt, in good faith and without knowledge of the
>> voidability of the transfer avoided.
>
> 11 U.S.C. § 550(b)(1).

of the $335,000 wired from the Bank Account to the Mortgagee in satisfaction of the Mortgage.
Obj. 7-10.  The Court finds no merit to those arguments.

The Bankruptcy Code does not define the term "transferee" or "initial transferee" and
there is no helpful legislative history.  *See Bonded Financial Services, Inc. v. European
American Bank,* 838 F.2d 890, 893 (7th Cir.1988).  Under the plain language of the statute, "the
party who receives a transfer of property directly from the debtor is the initial transferee."
*Incomnet, Inc. v. Universal Servs. Admin. Co. (In re Incomnet, Inc.),* 299 B.R. 574, 578 (9th Cir.
B.A.P. 2003) (*quoting* 5 COLLIER ON BANKRUPTCY [15th Ed. Revised], ¶ 550.02[4][a], pg. 550-
18), *aff'd* 463 F.3d 1064 (9th Cir. 2006).  *See also Ragsdale v. South Fulton Machinery Works,
Inc. (In re Whitacre Sunbelt, Inc.),* 200 B.R. 422, 426 (Bankr. N.D.Ga. 1996) ("Using plain,
dictionary definitions, 'an initial transferee under section 550 is the entity who received the
transfer in question directly from the debtor.'") (citation omitted).  In *Bonded,* the court
discussed, but did not resolve, the "equities" basis raised by other courts in rejecting a literal
application of § 550(a).  838 F.2d at 894-95.  Rather, the court found it was more appropriate to
resolve the "transferee" issue after employing "considerations of policy to *define* "transferee"
under § 550(a)(1).  *Id.* at 895 (emphasis in original).  In that case, the debtor's principal
misappropriated funds from the debtor.  He deposited a check drawn on the debtor's account and
made payable to the bank's order, with a note directing the bank to deposit the check into the
principal's account.  *Id.* at 891.  Ultimately, the bank applied the funds to reduce the outstanding
balance of the bank's loan to the principal.  *Id.*  The debtor's trustee sued the bank to recover the
payment as the initial transferee of a preferential transfer of funds under § 547 because it was the
payee of the check.  The court rejected that argument and held that the bank was not the "initial
transferee" because it acted as a "financial intermediary" and "received no benefit" from the

deposit. *Id.* at 893. It found that the bank became a subsequent transferee only when it debited

the account to pay down the principal's loan. *Id.* at 896-97. In that ruling, the court established

the so-called "dominion and control" test for determining whether a party is a transferee under §

550. The court stated:

> we think the minimum requirement of status as a "transferee" is dominion over
> the money or other asset, the right to put the money to one's own purposes. When
> A gives a check to B as agent for C, then C is the "initial transferee"; the agent
> can be disregarded.

*Id.*[34] In *Finley Kumble*, the Second Circuit analyzed *Bonded* and approved its reasoning in

adopting the "mere conduit" test for determining whether a party qualifies as a transferee under §

550(a)(1). 130 F.2d at 58. That test "frames *Bonded's* 'dominion and control' test in the

negative. Rather than stating that a party is an initial transferee if it exercises 'dominion and

control' over the funds, the Second Circuit states that a party is *not* an initial transferee if it was a

mere conduit of the funds." *See Bear Sterns v. Gredd (In re Manhattan Investment Fund)*, 397

B.R. 1, 14-15 (S.D.N.Y. 2007) (citations omitted) (footnote omitted) (emphasis in original).

Moreover, "the 'domination and control' test as stated in *Bonded* is now also an essential part of

the 'initial transferee' inquiry in this Circuit through the *Finley Kumble* court's reliance on

*Bonded*. Thus . . . an initial transferee must exercise dominion over the funds at issue and be

able to put them to 'his own purposes' even if it is not a 'mere conduit' in the standard sense of

the term." *Id.* at 15.

---

[34] In assessing whether the recipient of a voidable transfer is an "initial transferee" under § 550(a), the court contrasted two types of transactions. In a "one step transaction," the principal causes the company to issue a check payable directly to the principal's creditor. As an example, "[i]f the note accompanying [the] check [states]: 'use this check to reduce [the principal's] loan instead of 'deposit this check into [the principal's] account,' § 550(a)(1) would provide a ready answer. The [b]ank would be the initial transferee and [the principal] would be the entity for whose benefit the transfer was made." *Bonded*, 838 F.2d at 892. In the second scenario, "the principal first acquires legal title to the funds and then directs that they be used to payoff his creditor. In that "two-step transaction," the principal is deemed to be the "initial transferee" because he is exercising full dominion and control over the funds. *Id.* at 893–94.

A party has "dominion and control" over the transferred asset "to the extent that he or she may dispose of it as he or she pleases such as 'invest[ing] the [whole] amount in lottery tickets or uranium stock.'" *Stratton Oakmont*, 234 B.R. at 313 (*quoting Finley Kumble,* 130 F.3d at 57 (*citing Bonded*, 838 F.2d at 894)). *See also Hooker Atlanta (7) Corporation v. Hocker (In re Hooker Investments, Inc.),* 155 B.R 332, 338 (Bankr. S.D.N.Y. 1983) (initial transferee is one who can legally use the money for his own purposes). "The phrase 'mere conduit,' or some variation therefrom, has been coined by various courts to characterize those 'innocent' entities which are only agents or passthroughs of the transferee." *In re Kaiser Steel Corp.,* 105 B.R. 639, 644 (Bankr.D.Colo.1989). *See also Bonded,* 838 F.2d at 890 (A "conduit" is one who passes an asset on to the initial transferee pursuant to a legal or contractual duty."); *In re Manhattan Investment Fund*, 297 B.R. at 15 ("'Mere conduit' in the prototypical sense of the term . . . [means] a party that receives the money merely to pass it on to a third party . . . "); *Stratton Oakmont*, 234 B.R. at 313 (A party is deemed to be a 'mere conduit' or 'intermediary' when he or she takes possession of the asset "simply to forward it  to the initial transferee . . . if he or she does not receive any benefit from the initial transferee.")[35]  At the core of the "mere conduit' exception to strict liability under § 550(a) of the Code is the recognition that "it would be inequitable to impose strict liability reserved for an initial transferee on a conduit simply because he or she was the first to physically hold the money or property despite the fact that he or she was powerless 'to put the money to [his or her] own purposes.'"  *Id.* at 313 (quoting *Finley Kumble*, 130 F.3d at 57).  None of those concerns are present in this case.

---

[35] Thus, a "mere conduit" can be an entity that incidentally transfers money from a debtor to a third party either under a contractual or agency duty, such as banks, couriers, escrow agents, and law firms that simply hold funds for the benefit and subject to the direction of another.  *See, e.g., Bonded*, 838 F.2d at 893-94 (bank); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1204 (10th Cir. 2002) (escrow agent); *Lifecare Tech., Inc. v. Berman Law Firm, P.A. (In re Lifecare Tech., Inc.)*, 305 B.R. 88, 92 (Bankr. M.D. Fla. 2003) (law firm trust account).

Although Defendants' insist that "[they] did not receive any monies from the [D]ebtor" and that they "remained, unbeknownst to them, as a 'mere conduit' for the actual transferee [i.e. the mortgagee bank] . . .,"*see* Obj. 7, the facts do not bear that out.  The Debtor did not transfer the funds to Ratiba for the benefit of a third party.  It did so for her benefit directly.  The Transfers were in satisfaction of her claim against the Debtor under the Letter Agreement.  In this "one step" transaction, Ratiba was the initial transferee; her interest in the Bank Account and the Transfers was not that of a mere conduit.  *See Lowry v. Security Pac. Bus. Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26, 28 (4th Cir. 1989) ("When a creditor receives money from its debtor to pay a debt, the creditor is not a mere conduit."); *In re Bagwell,* 29 B.R. 461 (Bankr. D.Or. 1983) (bank was initial transferee where supplier assigned accounts receivable to the bank in satisfaction of its indebtedness to the bank, and the bank received payments directly from the debtor.).  *See also Bonded*, 838 F.2d at 893 (If debtor sends money to a bank that is earmarked to be applied in satisfaction of debtor's loan, the bank is the initial transferee of those funds); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1200 (11th Cir. 1988) (When a bank receives money from a debtor to pay off a debt owed to the bank, the bank is the initial transferee in control of those funds); *Committee of Unsecured Creditors v. U.S. Relocation Services, Inc. (In re 360Networks (USA), Inc.)*, 338 B.R. 194, 203 (Bankr. S.D.N.Y 2005) ("[T]here are virtually no [mere conduit] cases that allow the 'mere conduit' defense where the transferee receives the funds in payment of an expense that the transferee has already advanced on the credit of the debtor.").

Nor is there merit to Defendants' contention that Ratiba is not an "initial transferee" of the Transfers because she did not know about the Bank Account or the Transfers and, as such, could not exercise domination and control over them.  Defendants contend that any money

"routed through" the Bank Account was "without their knowledge.  Obj. 8.  They further assert

in their Objection that they "did not have any knowledge of the [T]ransfer[s] to render them

liable." Obj. 2.  They claim to "have no clue about the transaction that went through their bank

account."  Obj. 5.  Moreover, the Defendants assert that they "did not open the [A]ccount, nor do

they maintain it", and claim that they could not "exercise 'dominion' over the [Transfers]" with

"no information and no capacity to monitor or the will or knowledge to "put the money to [their]

own purpose.  Obj. 6.  Finally, the Defendants proclaim that they "do not maintain a bank

account, it is maintained for them by their children," and "neither of [the Defendants] exercised

any control of any funds that is received and disbursed from its account." Obj. 7.  First, those

repetitious inferences and conclusions are simply not persuasive given the overwhelming amount

of uncontroverted material facts in favor of the Trustee, and the Defendant's failure to raise any

genuine disputes to those material facts.    Nothing here actually calls any material facts into

question, and these statements, even if supported by the Ratiba Affidavit, do not rise to the level

of "evidence on which the jury could reasonably find for [Ratiba]."  *Scotto v. Almenas*, 143 F.3d

105, 114 (2d Cir. 1998) (*citing Liberty Lobby*, 477 U.S. at 252).  Second, they lend no support to

the opposition for the same reason as the assertions regarding Joseph's alleged role in managing

Ratiba's financial affairs, discussed *supra*, p. 26.  *See, e.g., Goenaga* 51 F.3d at 18 (unsupported

assertions, conjecture and surmise insufficient to defeat a motion for summary judgment); *Senno*,

812 F.Supp.2d at 467 (mere denials or unsupported alternative explanations of facts will not

sustain objection to summary judgment).

     Moreover, when courts speak of a party's lack of dominion and control over transferred

assets, the focus is on the whether the transferee has the legal right to put the assets to its own

use -- not whether the transferee had the right to do so but chooses not to exercise it.  *Finley*

*Kumble* is instructive.  There, a bankruptcy trustee sued an insurance broker and insurance

carrier to recover as alleged fraudulent transfers, malpractice insurance premiums paid to the

carrier prepetition.  The debtor sent the payments to the broker who then transferred them to the

insurance carrier.  *Finely Kumble*, 130 F.3d at 55.  The issue before the court was whether the

broker, having recommended the purchase of insurance to the then insolvent debtor, was an

"initial transferee" of the premiums and thus strictly liable to the trustee under § 550(a).  *Id*. at

56.  There, the court rejected that contention finding that the evidence established that the broker

was a "mere conduit" of the premiums.  In reaching that conclusion, the Court rejected the

trustee's assertion that the broker did not qualify as a conduit for the funds because it had

"undisputable additional functions" such that it was "no 'stranger' to either the debtor or the

underlying transaction that set the funds in motion . . . ."  *Id.* at 58.  The Court declined to

"freight the section 550 inquiry with the [trustee's] common law claims and related allegations,

none of which suggest that the funds transferred were for [the broker's] account or were diverted

to its account or otherwise challenge [the broker's] conduct *in its role as a conduit*."  *Id.* at 58-59

(emphasis original).  The Court found that since the broker had "no discretion or authority to do

anything else but transmit the money [to the carrier], which what it did," the broker was a "mere

conduit", not an initial transferee of the premiums.  *Id.* at 59.

Here, the undisputed evidence shows that at all times Ratiba had the absolute right to

utilize the Transfers in her discretion.  In making the Transfers, the Debtor did not condition or

otherwise limit Ratiba's right to use the transferred funds as she pleased.  That Ratiba allegedly

ceded her control over the Transfers and the Bank Account to her children does not insulate her

from liability.  That is because it does not alter the fact that she had unfettered control over the

Transfers. *Compare In re Cassandra Group*, 312 B.R. 491, 496-97 (Bank. S.D.N.Y. 2004) (the

holder of a Power of Attorney with "broad power to act" on another's behalf was a mere conduit because he lacked a legal right to put payments received to his own personal use).[36]  As the initial transferee of the Transfers, Ratiba is strictly liable to the Trustee for the Transfers.  *Red Dot Scenic, Inc.,* 351 F.3d at 58 (An initial transferee is "required to return the funds regardless of any potential good faith defense.").  *See also In re Pace*, 456 B.R. 253, 276 (Bankr. W.D. Tex. 2011) ("No . . . good faith defense is available to the initial transferee . . . the trustee may always recover from the initial transferee regardless of good faith, value or lack of knowledge of the voidability of the transfer.")[37]  Given that strict liability, Ratiba's knowledge or lack thereof is simply not probative of her initial transferee status, and certainly does not raise a genuine dispute over material facts.  *See Liberty Lobby*, 477 U.S. at 249-50 (If evidence "is not significantly probative . . . summary judgment may be granted.").

---

[36]  In this light, contrary to Defendants' assertions, *see* Obj. 10, Joseph is not an indispensable party to this adversary proceeding.

[37]  The Defendants misplace their reliance on *Nordberg, Bonded, Richardson v. United States (In re Anton Noll)*, 277 B.R. 875 (1st Cir. B.A.P. 2002) and *Northern Capital, Inc. v. Riederer (In re Brooke Corp.)*, 458 B.R. 579, 586-87 (Bankr. D.Kan. 2011).  *See* Obj. 6.  In *Nordberg*, *Brooke*, and *Bonded*, the party to whom the allegedly avoidable transfer was made had no legal right to control the disposition of the underlying assets that were transferred.  Accordingly, the party receiving the transfer was treated as a "mere conduit", not an "initial transferee," for purposes of § 550(a).  *See Nordberg*, 848 F.2d at 1200-01 (finding that bank that honored debtor's check to third party thereby creating overdraft in account was conduit, not initial transferee, of debtor funds when it received wired funds in process at time into debtor's account following day); *Brooke*, 458 B.R. at 586-87 (finding lead bank conduit to loan participants because bank lacked control over transferred funds under applicable contractual agreements); *Bonded*, 838 F.2d at 893 (holding bank was not "initial transferee" because it acted as "financial intermediary" and "received no benefit" from transfer).  Here, as noted, there were no limitations put on Ratiba's use of the Transfers; as such, those cases provide no support for the Defendants' position.  Nor does *Anton Knoll*.  There, the debtor's principal received a check drawn on the debtor's account and payable to "cash" that he subsequently used to purchase a bank check in the same amount that he delivered to the IRS in satisfaction of certain tax liabilities.  277 B.R. at 877.  After avoiding the debtor's transfer of the check to the principal as a fraudulent transfer, the chapter 7 trustee sued the IRS to recover the value of the check as the "initial transferee" of the check under § 550(a)(1) of the Code.  The court adopted the *Bonded* court's approach and found that the principal, not the IRS, was the initial transferee since under state law, the recipient of a check payable to "cash" has the legal right to use the proceeds as he pleased.  *Id.* at 880.  Here, Ratiba had the legal right to use the Transfers as she pleased.  *Anton Knoll* not only reinforces the maxim that initial transferees of avoided transfers are "strictly liable," *id.* at 878, but it also supports the Trustee's claim for relief against Ratiba.

Moreover, contrary to Defendants' contention, even if they established that Ratiba's children exerted such dominion and control over the Bank Account that the children should be treated as the "initial transferees" of the Transfers for purposes of § 550(a)(1), Ratiba would not be a "subsequent transferee" of the Transfers for purposes of § 550(b). A subsequent transferee "is one who takes in a later transfer down the chain of title or possession." *Watts v. MTC Development LLC (In re Palisades at West Paces Imaging Center, LLC),* 501 B.R. 896, 916 (Bankr. N.D. Ga. 2013) (quoting *In re Knippen*, 335 B.R 710, 728 (Bankr. N.D. Ill. 2006 (citation omitted), *aff'd Knippen v. Grochocinski*, 2007 WL 1498906 (N.D. Ill. 2007)). "The immediate transferee is the one who receives a transfer from the initial transferee and all other recipients are mediate transferees." *Id*. at 916-17 (citing *In re Appleseed's' Intermediate Holdings, LLC*, 470 B.R. 289, 301 (D. Del. 2012)). Ratiba did not receive a distribution from the funds on deposit in the Bank Account. As such, she cannot be a "subsequent transferee" of the Transfers.[38]

Nor is there merit to Defendants' assertion that the Mortgagee is the initial transferee of the $335,000 wired from the Bank Account to satisfy the Mortgage and that Ratiba is the "subsequent transferee" of that transfer. The Mortgagee is not the initial transferee of those funds because the Transfers were made into the Bank Account, not directly to the Mortgagee, and Ratiba was not a "mere conduit" of the Transfers for the Mortgagee's benefit. It is undisputed that on or about March 17, 2011, the sum of $335,000 was transferred from the Bank

---

[38] However, in that case, she would likely be the party who benefitted from the Transfers, and thus still liable under section 550(a)(1). "The key to pegging the entity for whose benefit the initial transfer was made has two sides: 1) the entity must be the intended beneficiary, and 2) the intended benefit must originate from the initial transfer." *Stratton Oakmont,* 234 B.R.at 314 (citations omitted). *See also Bonded,* 838 F.2d at 895 ("The paradigm 'entity for whose benefit the transfer was made' is . . . someone who receives the benefit but not the money.") There is no dispute that in wiring/depositing the funds into the Bank Account, the Debtor intended to satisfy Ratiba's claim against the Debtor due to her under the Letter Agreement. Ratiba plainly benefitted from that transfer by receiving the full value on account of her claim. Like an initial transferee, the party for whose benefit the transfer was made is strictly liable for the avoided transfers. *See Finley Kumble*, 130 F.3d at 57.

Account to the Mortgagee in satisfaction of the Mortgage.  Thus, the Mortgagee was the subsequent transferee of those funds.  *See In re Whitacre Sunbelt, Inc.*, 200 B.R. at 426 (where "debtor [transfers funds] to an insider, who then uses the funds to pay [her] own creditor . . . the insider is the initial transferee and [her] creditor is the subsequent transferee.") (citations omitted).

Based on the foregoing, the Court recommends finding that the Trustee has established that Ratiba is the "initial transferee" of the Transfers and, as such, under the First Claim should be found to be strictly liable to the estate for the Transfers or the value thereof.

**<u>Wahid Saleem</u>**

The Trustee contends that Wahid is liable to the estate as a "subsequent transferee" of the Transfers because he "received a debt-free house for no value from the initial transferee, his wife Ratiba."  Reply 6.  In substance, he reasons that because Ratiba, the "initial transferee" of the Transfers, transferred $335,000 of the transferred funds to the Mortgagee to pay off the Mortgage, he can "trace" the value of those funds into the Premises, making Wahid, as the new owner of the Premises, a "subsequent transferee" of the value of those funds.  *See* T. Memo. 2 ("After utilizing Debtor's fund[s] [i.e. $335,000 of the Transfers] to satisfy the mortgage on her primary residence [i.e. the Premises], Ratiba . . . made a subsequent transfer of the value of the Debtor's funds by transferring title to the [Premises] to . . . Wahid . . .").  *See also* Reply 6 ("[W]ithin one week of receiving the Transfers, Ratiba used a portion of the funds now in her bank account to satisfy an existing $335,000 mortgage on her home" and thereafter "Ratiba transferred her now debt-free property to her husband . . . Wahid . . . for no consideration.");

Reply 17 ("The [M]ortgage was clearly satisfied with the Debtor's funds. A little over a month

later . . . Ratiba . . . transferred this same property to her husband, Wahid . . . ").[39]

As a preliminary matter, the Court notes that Wahid is not a party to the First Claim of

the Complaint and, as such, the Trustee has not sought relief against him as a subsequent

transferee of the Transfers at issue therein. Wahid is only a party to the Complaint's Eighth

Claim for Relief. There, the Trustee seeks to avoid and recover the "Subsequent Transfer" from

Wahid as a fraudulent transfer under §§ 278 and/or 279 of the NEW YORK DEBTOR AND

CREDITOR LAW (as made applicable by § 544 of the Code) and § 548 of the Code. Compl. ¶¶ 61-

65.[40] The Motion seeks no relief in regard to Claim Eight. But even assuming, *arguendo*, that

the Complaint could be construed to include a claim in the First Claim against Wahid as a

subsequent transferee of the Transfers, the Trustee has not shown that he is entitled to relief

against Wahid.

To prove that Wahid qualifies as a "subsequent transferee" of the Transfers under §

550(a)(2), the Trustee must establish that Wahid received all or a portion of the Transfers from

either Ratiba, as initial transferee, or a later transferee. *See* 5 COLLIER ¶ 550.02[4][a]-[c], pp.

550-20 – 550-23 (To prove that party qualifies as a "subsequent transferee" pursuant to section

---

[39] The Trustee further argues that because Wahid paid nothing for the Premises and should be deemed to have knowledge of the avoidance of the transfer, Wahid cannot benefit from the defenses under § 550(b)(1) and is liable to the estate as the subsequent transferee of an avoided preference [i.e. the Transfers] under § 550(a)(2) of the Code. *See* T. Memo. 17; Reply 6. The foregoing is only relevant to defeat Wahid's alleged defense if Wahid is an immediate or mediate transferee under § 550(a)(2). The Court does not reach that issue, however, because, as explained below, the Court finds that the Trustee has not established on summary judgment that Wahid is a subsequent transferee of the Transfers.

[40] As noted previously, the term "Subsequent Transfer" is synonymous with the "Premises." *See supra* note 3. In support of Claim Eight, the Trustee alleges that Ratiba transferred the Premises directly or indirectly to Wahid and, as such, Wahid is an immediate or mediate transferee of the Premises. Compl. ¶¶ 62-64. Accordingly, the Trustee contends that pursuant to state and federal fraudulent conveyance law, he is entitled to a judgment against Wahid (i) avoiding the transfer of the Premises; (ii) directing that transfer of the Premises to Wahid be set aside; and (iii) recovering the Premises, or the value thereof, from Wahid for the benefit of the Debtor's estate. (Comp. ¶ 65).

550(a)(2), plaintiff must establish that party (i) received property of the estate and (ii) received it either directly from the initial transferee or from a later transferee.)  The Trustee has failed to meet that burden on summary judgment.  As previously noted, the Mortgagee is a subsequent transferee of $335,000 of the Transfers.  It applied those funds in satisfaction of the Mortgage; it made no transfer to Wahid.  Moreover, it is undisputed that Ratiba transferred *her* property, the Premises, to Wahid.  She did not transfer any part of the Transfers to him.[41]  Among other things, the Trustee cited three cases in support of his contention that he is entitled to a judgement against Wahid.  *See* T. Memo. 15-16 (citing *In re Allou Distributors, Inc.*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007), *IBT Int'l, Inc. v. Northern (in re Int'l Admin. Servs. Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005); and *In re G-I Holdings, Inc.*, 338 B.R. 232, 253 (Bankr. D.N.J. 2006)).  As relevant herein, those cases stand for the proposition that when seeking to recover a fraudulent transfer from a subsequent transferee under § 550(a)(2) of the Code,  the plaintiff bears the burden of establishing that the assets at issue are estate property, and that in appropriate circumstances where funds are involved, the plaintiff may not be required to trace the funds dollar for dollar.  However, those cases are distinguishable since each of them involved the tracing of cash or other assets from the debtor to the respective defendants.  Here, in seeking a recovery from Wahid, the Trustee is not tracing any asset from the Debtor to Wahid.  Rather, he is seeking to recover an asset owned and transferred by Ratiba in her own right.

The Court notes that its conclusions regarding the Trustee's claims against Wahid differ from those reached by the Court in the Decision and as reflected in the Order and Judgment (all now vacated) previously entered in favor of the Trustee.  In the Decision, the Court found that "the Trustee is entitled to judgment [on the Motion] as a matter of law."  *See* Decision 8.  The

---

[41]  The Court also does not reach Wahid's asserted *bona fide* purchaser defense, *see* Obj. 9-10, as mentioned *supra*, p. 12.

Court found that the Transfers were preferential transfers under § 547 of the Code and that the "Trustee is entitled to avoid and preserve [the Transfers], or the value thereof, from Ratiba Salim for the benefit of the Debtor's estate." *Id.* Although Wahid is not named in the First Claim the Court also found that "the Trustee . . . is entitled under 11 U.S.C. § 550, to avoid and recover the subsequent transfer of Debtor funds – that is, the funds transferred initially to Ratiba Salim to satisfy the mortgage on the Premises – or the value thereof, by Ratiba Salim to Wahid Saleem." *Id.* On March 20, 2014, the Court issued its Order Granting the Motion [AP ECF Doc. No. 46]. Again, although the Motion sought summary judgement only on the First Claim for Relief, the Order granted judgment to the Trustee on the First and Eighth Claims for Relief. In doing so, the Court (i) ordered that transfers from the Debtor to the Bank Account totaling $705,000 were avoided pursuant to section 547(b) of the Bankruptcy Code, and (ii) pursuant to 11 U.S.C. § 550, awarded recovery of the Transfer and Subsequent Transfer, or the value thereof, against Ratiba and Wahid. *Id.* at *2. There is no basis on the record of the Motion for the Court to make any findings regarding Claim Eight of the Complaint. Neither the Plaintiff nor Wahid have sought relief under that claim.[42]

## Conclusion

Based on the foregoing, and for the reasons stated, the Court recommends that the District Court grant judgment to the Trustee against Ratiba on the First Claim for Relief pursuant to §§ 547(b), 550(a)(1), and 551 of the Code (i) avoiding and preserving the Transfers for the benefit of Big Apple's estate; (ii) directing the Transfers to be set aside; and (iii) recovering the

---

[42] To the extent the Trustee seeks to set aside the Subsequent Transfer under New York Debtor and Creditor Law §§ 278 and/or 297, those remedial provisions are available to the Trustee only in connection with the avoidance of fraudulent transfers, not preferential transfers under § 547 of the Code. *See* NY DEBT & CRED § 278 (McKinney 2016) ("When a conveyance or obligation is fraudulent as to a creditor . . . .") and NY DEBT & CRED § 279 (McKinney 2016) ("Where a conveyance made . . . is fraudulent as to a creditor whose claim has not matured . . . .").

Transfers or value thereof from Ratiba.  The Court does not recommend entering judgment

against Wahid as he is not party to the First Claim for Relief.  In any event, the Trustee has not

established on summary judgment that he is an immediate or mediate transferee of the

preferential transfer and, thus, liable to the Trustee for those transfers or the value thereof under

§ 550(a)(2) of the Code.

The Court directs that the Clerk shall serve forthwith copies of these Proposed Findings

of Fact and Conclusions of Law on all parties by mail and note the date of mailing on the docket.

Within 14 days after being served with a copy, a party may serve and file with the Clerk written

objections that identify the specific proposed findings and conclusions objected to and state the

grounds for such objections.  A party may respond to another party's objections within 14 days

after being served with a copy thereof.

Dated: New York, New York
     March 17, 2016
                     /s/*James L. Garrity, Jr.*
                     _____
                     Hon. James L. Garrity, Jr.
                     U.S. Bankruptcy Judge